UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:04-CV-234-GCM

BURTON A. GELLMAN, AND THE
GELLMAN CORPORATION,
                                Plaintiffs,

v.

THE CINCINNATI INSURANCE COMPANY,
                                Defendant.

## **OPINION**

THIS MATTER IS BEFORE THE COURT pursuant to a stipulated procedure wherein the parties seek a declaration by the court of the proper measure of the covered loss owed by Cincinnati to Gellman under an insurance policy issued by Cincinnati.

### **FACTS**

The parties generally agree on the operative facts and the court needs only to highlight them for the purposes of this order.

Gellman built and owned the Coer de Charlotte apartments (the "Building") located at 1200 Queens Road, Charlotte, North Carolina. The Queens Road area is a very fashionable area and property there has dramatically appreciated in value since the Building was constructed in the late 1970's. The Building was insured by Cincinnati which originally issued a commercial property policy (the "Policy") in 1999 which was renewed in 2002.

The Policy was a replacement cost policy in contradistinction to an actual cash value policy, which included property coverage for the Building for $4,500,000.00. Cincinnati and Gellman agreed that replacement cost of the Building was $4,483,854.00 as of 31 December 2002, in order to avoid any co-insurance issue in the event of a loss.

The Building was "L" shaped three stories in height with 43 apartment units and Mr. Gellman's office located therein. Early on 24 February 2003, a fire broke out in a ground floor unit and heavily damaged that unit, the unit above, and generated a significant amount of smoke as well. Subsequent to the fire, Cincinnati determined the cost to repair the Building to be $649,899.98, while Gellman provided an estimate of $2,133,682.00. The parties could not agree on an estimate so Cincinnati paid Gellman based on its estimate and invoked appraisal to determine what was owed.

The appraisal process involved each party selecting an appraiser and later, after initial disagreement, both parties agreed to an umpire. Cincinnati's appraisal of repair costs to restore the Building to a condition equal to or better than its pre-fire condition was $679,899.98. Gellman appointed Jack C. Morgan, MAI, as its appraiser and Mr. Morgan estimated the reasonable cost of repair as $1,648,000. In addition, Mr. Morgan appraised the Building and found its value to be $544,000 prior to the fire but worthless in its damaged condition. Gellman also provided an additional repair estimate including a "no smoke odor guarantee" in the amount of $1,514,285.22. No one other than Mr. Morgan appraised the value of the Building and there appears to be no dispute that his appraisal was accurate. The umpire selected for the appraisal subsequently agreed with Cincinnati's estimate for repair but Mr. Gellman did not accept the result of the appraisal and the parties have stipulated that this court is not bound by the result of the appraisal.

The parties have stipulated that the Building could have been repaired to a condition equal to or better than its pre-fire condition. However, the Building was not repaired but the property was sold by Mr. Gellman and subsequently razed by the purchaser. Because any

estimate of the cost of the repair exceeded the value of the Building Mr. Gellman maintains that the Building was a total loss as a result of the fire and demands the full loss under the policy of $4,500,000 and instituted the instant lawsuit.

After much litigation, the parties have entered stipulations which resolve any factual disputes and present this court with the sole issue of deciding the proper measure of determining the covered loss under the Policy.

## DISCUSSION

Resolution of the issue before the court requires reference to the language of the Policy which provides in relevant part:

**SECTION A. COVERAGE**

We will pay for direct physical "loss" to Covered Property at the "premises" described in the Declarations caused by or resulting from any Covered Cause of Loss.

\* \* \*

**SECTION D. LOSS CONDITIONS**

The following conditions apply in addition to the COMMON POLICY CONDITIONS and the COMMERCIAL PROPERTY CONDITIONS.

4. Loss Payment

   a. In the event of "loss" incurred by this Coverage Form, at **our option**, we will either

      (1) Pay the value of lost or damaged property;

      (2) Pay the cost of repairing or replacing the lost or damaged property;

  (3)  Take all or any part of the property at an agreed or appraised value; or

  (4)  Repair, rebuild, or replace the property with other property of like kind and quality.

(Emphasis added).

 b. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property, except as provided in SECTION A. COVERAGE, 4. Additional Coverages, h. Ordinance or Law.

 c. We will give notice of our intentions within 30 days after we receive sworn proof of loss.

 d. We will not pay you more than your financial interest in the Covered Property.

\* \* \*

7. Valuation

We will determine the value of Covered Property in the event of "loss" as follows:

 a. At "Actual Cash Value" as of the time of "loss", except as provided in b., c., d., e., and f. below.

\* \* \*

**SECTION F. OPTIONAL COVERAGES**

If shown in the Declarations, the following Optional Coverages apply separately to each item.

3. Replacement Cost

 a. Replacement Cost (without deduction for depreciation) replaces "Actual Cash Value" in SECTION D. LOSS CONDITIONS, 7. Valuation, Part a. Of this

Coverage Form.

c. You may make a claim for "loss" covered by this insurance on an "Actual Cash Value" basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an "Actual Cash Value" basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the "loss".

d. We will not pay on a replacement cost basis for any "loss":

    (1) Until the lost or damaged property is actually repaired or replaced:

        (a) On the described "premises"; or

        (b) At some other location in the State of North Carolina; and

    (2) Unless the repairs or replacement are made as soon as reasonably possible after the "loss".

e. We will not pay for more "loss" on a replacement cost basis than the least of:

    (1) the Limit of Insurance applicable to the lost or damaged property;

    (2) The cost to replace the lost or damaged property with other property;

        (a) Of comparable material and quality; and

        (b) Use for the same purpose; or

    (3) The amount you actually spend that is necessary to repair or replace the cost or damaged property.

\* \* \*

**SECTION G. DEFINITIONS**

1.  "Actual Cash Value" means replacement cost less a deduction that reflects depreciation, age, condition and obsolescence.

In "actual cash value" policies, an insurer is obliged to pay to a policy holder who suffers a covered loss the depreciated value of the insured item – its actual cash value at the time of the loss. In this scenario, an insured is made less than whole because he cannot avoid suffering the economic loss of depreciation of the asset. Insurance companies began to essentially insure against the depreciation loss by writing replacement value policies which obligate the company to pay for the repair or replacement of the damaged property to its pre-loss condition. This obviously leads to the policy holder receiving a better asset than he had before the loss. For example, a depreciated carpet in a fire damaged building will be replaced with new carpet. However, replacement cost coverage does not take effect until the lost or damaged property is actually repaired or replaced. See e.g. *Gilbert v. N.C. Farm Bureau Mut. Ins. Co.,* 155 N.C. App. 400, 404, 574 S.E2d 115, 118 (2002).

The essence of the controversy between the parties is relatively simple to state. Cincinatti contends that under the terms of the policy, Gellman is only entitled to the cost of repairs that would have been necessary to bring the Building to a condition equal to or better than its pre-fire condition. Gellman, on the other hand, contends that the Building is a total loss because the cost to repair, under any estimate of such costs, exceeds the fair market value of the Building. In essence, Gellman's position is that much like the owner of an automobile which sustains damage which costs more to repair than the market value of the car, is said to have his car totalled, he too has suffered a total loss. Gellman even cited *Allen v. Am. Sec. Ins. Co.,* 53 N.C. App 239, 280 S.E.2d 471 (1981) to support this proposition. That and any similar cases are inappropriate as

they involve motor vehicle insurance policies which specifically provide for the result Gellman asserts. No such specific language exists in the Policy involved here and it is the language of that Policy which determines the outcome.

This court must interpret the Policy language to determine the proper measure of damages due under the policy. The Policy at issue is nothing more than a contract, and the terms and provisions of that contract govern the relationship between the parties. " '[T]he construction and application of the policy provisions to the undisputed facts is a question of law for the court.' " *Cone Mills Corp. v. Allstate Ins. Co.,* 114 N.C. App 684, 686, 443 S.E.2d 357, 359 (1994) *disc. rev. allowed,* 337 N.C. 690, 488 S.E.2d 518 (1994) *disc. rev. improvidently allowed,* 340 N.C. 353, 457 S.E.2d 300 (1995) (Cites omitted).

The North Carolina Supreme Court in *Woods v. Nationwide Mut. Ins. Co.,* 295 N.C. 500, 505-506, 246 S.E.2d 773, 777 (1978), set forth the guidelines for analyzing the construction of an insurance policy:

> As with all contracts, the goal of construction is to arrive at the intent of the parties when the policy was issued. Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the policy are be to harmoniously construed, and if possible, every word and every provision is to be given effect. If, however, the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder. ***Whereas, if the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties no bargained for and found therein.*** (Emphasis added).

The relevant portions of the policy appear at the start of this discussion.

At this juncture, it should be noted that this matter is before the court in the exercise of its diversity jurisdiction thus applicable state law must be applied – North Carolina law. Neither party has cited, nor has the court found any North Carolina precedent which unequivocally considered and decided that when repair cost exceeds fair market value under a replacement cost policy, the insured property suffers a total loss. Indeed, if such unequivocal precedent existed, this litigation most assuredly would not exist.

In support of his argument, Gellman relies principally on the decision of the North Carolina Court of Appeals in *Suratt v. Grain Dealers Mut. Ins. Co.,* 74 N.C. App. 288, 328 S.E.2d 16 (1985). While admitting that *Suratt* involved an actual cash value claim, Gellman asserts that the analytical methodology employed by the Court of Appeals should control the outcome of this case. Indeed, the Court of Appeals allowed fair market value to evidence actual cash value. However, the Court of Appeals specifically noted the trial court's findings that the dwelling at issue "could not be replaced because of its style, its matter and method of construction, the materials used in constructing it, current building methods and the requirements of electrical and building codes." 74 N.C. App. 288, 294, 328 S.E.2d 16, 20. While the court noted that the trial court made findings as to the cost of repairing the dwelling but found that repair was impractical, there is no suggestion that the impracticality was occasioned by the cost of repair exceeding value. Clearly, the physical and legal constraints made the rebuild impractical whatever the cost of repair would have been. Thus *Surrat* does not carry the day for Gellman.

Gellman also cites *Rutherford v. Royal Ins. Co.,* 12 F.2d 880 (4th Cir. 1926) as further support. Indeed, if sufficiently on point, that case would be controlling authority on this court, but it is not. There Mrs. Rutherford owned a commercial building which sustained a fire which

8

damaged the building to the point that it was no longer habitable or usable for any purpose. The building was valued at $21,000 pre-fire condition with physical damage fixed at $4,000.00.

The City of Asheville condemned the Building and ordered its removal; Mrs. Rutherford complied and claimed a total loss. The trial judge directed a verdict of $4,000.00, the agreed amount of physical damage. The insurer argued that the fire didn't cause the loss, but merely revealed the dilapidated condition of the building. The Fourth Circuit reversed, holding that the case should have gone to the jury and quoted the general rule as follows:

> "If by reason of public regulations as to the rebuilding of buildings destroyed by fire, such rebuilding is prohibited, the loss is total, although some portion of the building remains which might otherwise have been available in rebuilding. So, also, if the insured building is so injured by the fire as to be unsafe and is condemned by the municipal authorities, the loss is total. (Citations omitted.)" 12 F.2d 880, 881.

Thus in *Rutherford*, the totality of the loss was clear and the only issue was the cause of the loss. Here no such fact situation exists. Gellman had no "public regulation" preventing him from restoring the Building to its pre-fire condition and the parties agree it could have been done. Both parties cite other numerous cases from other jurisdictions but this court finds none are persuasive and the inquiry must turn to the Policy itself.

The applicable Policy language in paragraph 4(a) provides that in the event of loss, Cincinnati has the option to take one of four actions and further provides in paragraph 4(c) that it will give notice of which action it will pursue within 30 days after it receives a sworn proof of loss. Gellman argues that Cincinnati did not give timely notice and forfeited its right to choose but that argument fails. The parties both proceeded with the claim as one for repair or replace well before Gellman tendered his sworn proof of loss on or about November 30, 2003, and

9

Cincinnati responded by letter dated December 22, 2003, well within the requisite 30 day period.

The Policy specifically provides that Cincinnati will pay Gellman for "direct physical 'loss' to covered property at the 'premises' described in the Declarations caused by or resulting from any covered cause of loss." (Policy Section A Coverage *supra*.) This is unambiguous language and does not obligate Cincinnati to pay for damages that are not directly to the Building itself. Simply put, non-physical losses are not covered. As noted, Cincinnati had the option in the event of loss of paying the cost of repairs, taking the property for an agreed price, or repairing the property itself. Cincinnati chose to pay the cost of repairs. The Building was not a total loss and Cincinnati is obligated pursuant to the policy language to pay only the cost of repairs for the partially damaged Building. The fact that repair cost exceeds the fair market value of the Building is irrelevant to Cincinnati's obligation under plain policy language.

The parties stipulated that the issue for the court to decide is the following:

> Pursuant to the applicable policy language and caselaw, which position of the parties represents the proper measure of determining the amount of covered loss owed by Cincinnati to Gellman under the policy for the building claim as a result of the fire of February 24, 2003?

Based on the foregoing analysis and discussion, the court decides that the position urged by Cincinnati is the proper measure for determining the amount of covered loss.

The Clerk is directed to prepare and enter judgment accordingly.

Signed: March 17, 2009

Graham C. Mullen
United States District Judge